LAW LIBRARY

NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER

NO. 29624

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
KEHAULANI TERLEP, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 05-1-299K)

SUMMARY DISPOSITION ORDER
(By:  Nakamura, C.J., Foley and Fujise, JJ.)

Defendant-Appellant Kehaulani Terlep (Terlep) appeals from the Amended Judgment filed on December 15, 2008 in the Circuit Court of the Third Circuit[1] (circuit court).  The circuit court convicted Terlep of Theft in the Second Degree in violation of Hawaii Revised Statutes (HRS) § 708-831 (Supp. 2004).

On appeal, Terlep raises the following points of error:

(1)  The circuit court erred in admitting the State of Hawaiʻi's (the State) Exhibits 48[2] and 49[3] into evidence at trial, and if Exhibits 48 and 49 had been excluded, Terlep's motion for judgment of acquittal at the close of the State's case should have been granted.

(2)  The circuit court erred in denying Terlep's oral motion for judgment of acquittal at the close of State's case.

(3)  Terlep was denied effective assistance of counsel because defense counsel failed to call Harold Hall, M.D., (Dr. Hall) and Henry Yang, M.D., (Dr. Yang) as witnesses to testify to Terlep's mental state.

---

[1]  The Honorable Elizabeth A. Strance presided.

[2]  Exhibit 48 is a Department of Human Services (DHS) transaction history of Terlep's cash benefits from January 1999 through September 2001.

[3]  Exhibit 49 is a DHS transaction history of Terlep's food stamp benefits for the period October 1999 through September 2001.

(4) Terlep was denied effective assistance of counsel because defense counsel objected to evidence that could have discredited the State's key witness.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant statutory and case law, we conclude that Terlep's appeal is without merit.

**A. STATE'S EXHIBITS 48 AND 49 WERE PROPERLY ADMITTED PURSUANT TO HAWAII RULES OF EVIDENCE (HRE) RULE 803(b)(6).**

Terlep contends the circuit court erred in admitting State's Exhibits 48 and 49 under HRE Rule 803(b)(6) (1993) because (1) the State did not produce an employee or representative of City Corp. or J.P. Morgan to authenticate the exhibits, (2) the State did not prove the exhibits were produced in the course of regularly conducted activity at or near the time of Terlep's alleged criminal activity, (3) and the records do not identify Terlep other than by name.

The State argues that Wayne Akizaki (Akizaki), as DHS's EBT[4] Project Manager, was qualified to authenticate Exhibits 48 and 49; City Corp. maintained the information in State's Exhibits 48 and 49 as part of its regularly conducted business; Rule 803(b)(6) does not require a party to specify when an exhibit is compiled or to particularly describe the routines used to compile the information in an exhibit; and the evidence at trial established a sufficient nexus between the exhibits and Terlep.

HRE Rule 803(b)(6) provides:

> **Rule 803 Hearsay exceptions; availability of declarant immaterial.**
> . . . .
>
> (b) Other exceptions.
> . . . .

---

[4] Electronic Benefits Transfer.

> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, unless the sources of information or other circumstances indicate lack of trustworthiness.[5]

The commentary to this rule explains:

> Paragraph (b)(6) and (7): These exceptions are based upon Fed. R. Evid. 803(6) and (7) and a prior statute, [HRS] § 622-5 (1976) (repealed 1980) (originally enacted as L 1941, c 218, §§ 1, 2, 3; am L 1972, c 104, § 2(e)). However, both the federal rules and the prior Hawaii statute limited admissibility to records of regularly conducted business activities, while the present rule has no such limitation. . . . In any event, the hallmark of reliability in this area is not the nature of the business or activity but rather its "regularity and continuity which produce habits of precision, [the] actual experience of [a] business in relying upon [the records], [and the] duty to make an accurate record as part of a continuing job or occupation." Fed. R. Evid. 803(6), Advisory Committee's Note. A further safeguard is that preliminary determination of the trustworthiness of such records is discretionary with the court.

State v. Fitzwater, 122 Hawai'i 354, 227 P.3d 520 (2010), is dispositive on the issue of whether State's Exhibits 48 and 49 were properly admitted under Rule 803(b)(6).

Terlep argues that the circuit court improperly admitted Exhibits 48 and 49 under Rule 803(b)(6). Exhibits 48 and 49 are printouts indicating, respectively, the transactional histories for financial assistance and for a food stamp account under the name Kehaulani Terlep. At trial, Akizaki agreed that Exhibits 48 and 49 were true and correct copies of what he provided to DHS's investigator, Wayne Ayudan. Akizaki testified that J.P. Morgan had provided him with the printouts. Akizaki further testified that J.P. Morgan began operating Hawai'i's EBT system in 2002 when it bought out City Corp. Electronic Financial

---

[5] HRE § 803(b)(6) was amended in 2002 to permit laying a foundation by "certification that complies with [HRE] Rule 902(11) or a statute permitting certification." HRE § 803 (Supp. 2009).

Services, Hawai'i's original EBT contractor.[6]  Akizaki stated that the EBT system consists of two sub-accounts:  one for cash payments (financial assistance) and one for food stamps.

Akizaki explained that when clients apply for assistance through DHS, DHS collects the clients' demographic information (such as name, address, social security number, and date of birth) and enters this data into its systems (demographic file).  Once DHS determines a client's eligibility, it authorizes payment and the authorization is entered into an issuance file. The demographic and issuance files are then transmitted nightly to J.P. Morgan and uploaded into its system.

Based on this information, J.P. Morgan creates an EBT account for the client and assigns an EBT card to the account. When a client swipes the card, J.P. Morgan ensures that the vendor is authorized to take EBT and verifies the validity of the card and that there are sufficient funds in the account.  The State required J.P. Morgan to establish a settlement process to make sure that vendors and ATM owners will be paid on a timely payment basis and a reconciliation process to ensure that whatever payments the State authorizes for its clients are maintained correctly and reported to the State on a timely basis.

Akizaki testified that DHS personnel collect and enter information on clients into the State's systems as part of DHS's regularly conducted business.  DHS personnel are duty-bound to accurately and completely enter this information soon after eligibility is determined.  Additionally, the nightly transmission of demographic and issuance files from DHS to J.P. Morgan is also regularly conducted.  Akizaki explained that it is part of J.P. Morgan's contractual duty with the State to accept

---

[6]  According to Akizaki, the U.S. Department of Agriculture mandated in the 1980s that all states had to implement an EBT system for the food stamps program.  Because Hawai'i is a small state, Hawai'i opted in 1996 to join a coalition of states called the Western States EBT Alliance, WSEA.  The coalition selected City Corp. Electronic Financial Services as its first EBT contractor.

the transmitted information and to organize, maintain, and respond to the information. J.P. Morgan organizes and maintains this information in accordance with contractually prescribed rules. The State offered evidence through Akizaki's testimony that the same basic procedures and processes used by J.P. Morgan had been used by the State's prior EBT contractor, City Corp., whose EBT operations J.P. Morgan had acquired.

Given this evidence, we conclude that State's Exhibits 48 and 49 were properly admitted as business records pursuant to Fitzwater.

Akizaki's testimony sufficiently indicates that DHS incorporated the EBT contractor's EBT accounting into its records and relied on it. Akizaki testified that DHS relies on the EBT contractor to "maintain all of the transactions that our clients do when they use their EBT card." Additionally, the EBT contractor is required "to submit reports to [DHS] to make sure that all of the accounting side matches up with all of the transactions that [DHS] transmitted over to them, and making sure that all of the accounting side balances out correctly."

Akizaki's testimony also sufficiently indicates indicia of reliability. The State has a contract with the EBT contractor that prescribes how the EBT contractor will operate the State's EBT system. See Fitzwater, 122 Hawai'i at 369-70, 227 P.3d at 535-36 (concluding that police officer's testimony did not adequately establish indicia of reliability because police officer did not indicate there was any contractual relationship that would require shop performing speed check on officer's vehicle to accurately conduct and record speed check.) Additionally, the State's auditing of the EBT contractor's accounting strengthens the indicia of reliability.

Under Fitzwater, a proper foundation for the admission of a business record includes the requirements of Rule 803(b)(6). Fitzwater, 122 Hawai'i at 367-68, 227 P.3d at 533-34. The State's Exhibits 48 and 49 evidence DHS's "acts" of authorizing

payments to a cash benefits and food stamp account under the name of Kehaulani Terlep from January 1999 through September 2001 (cash benefits) and October 1999 through September 2001 (food stamps).

Exhibits 48 and 49 were made in the course of regularly conducted activity. Akizaki testified that the EBT contractor was contractually bound to maintain client EBT accounts for DHS on a regular basis. The State presented evidence that the EBT transactions were done electronically and instantaneously recorded in the system.

The entries in Exhibits 48 and 49 were made at or near the time of the acts recorded. Terlep alleges that the EBT contractor compiled the exhibits after 2002 and they therefore were not made at or near the time of the acts recorded. Terlep confuses the EBT accounting with the transaction history printouts. See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2nd Cir. 1994) ("A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the 'original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice.'") (quoting United States v. Hernandez, 913 F.2d 1506, 1512-13 (10th Cir. 1990), cert denied, 499 U.S. 908, 111 S. Ct. 1111 (1991)).

It is immaterial that no representative from City Corp. or J.P. Morgan authenticated Exhibits 48 and 49. Akizaki was a qualified witness pursuant to Fitzwater, 122 Hawai‘i at 366, 227 P.3d at 532 (noting that "an employee of a business that receives records from another business can be a qualified witness who can establish a sufficient foundation for their admission as records of the receiving business under HRE Rule 803(b)(6)").

Terlep argues that because Exhibits 48 and 49 only identify Terlep by the name Kehaulani Terlep, "[t]here is insufficient proof that they are for the same person." We disagree.

At trial, Kelly Okoji (Okoji), a State eligibility worker, testified that she interviewed Terlep for financial and food stamp assistance on February 1, 2000 and February 12, 2001. Okoji testified that at the interview she verified Terlep's identity by examining Terlep's driver's license.[7] Okoji further testified that after she interviews a client, she determines eligibility and inputs the client's information into DHS systems accurately and completely.

At trial, Lorene Higa (Higa), a DHS eligibility worker, testified that she reviewed Terlep's case file for trial. Higa explained that State's Exhibit 8 was an Application for Financial and Food Stamps Assistance signed by Kehaulani Terlep and submitted to DHS in February 1999. Higa further explained that Jane Nagano[8] received the application and determined Terlep's eligibility accordingly. Higa testified that typically after DHS receives applications, DHS workers conduct interviews and input information accurately and completely into DHS systems.

On cross-examination, Terlep admitted that she had applied for welfare, renewed her applications, and filed monthly eligibility reports as Okoji and Higa had testified.

This testimony indicates that Terlep communicated eligibility information to DHS and DHS workers accurately and completely transferred this information into DHS systems. We note that the EBT contractor accepts this information, as transmitted, and thereupon creates the client EBT account. We also note that the EBT contractor manages these accounts according to prescribed contractual rules and that DHS audits the EBT contractor's accounting.

Given the weight of this testimony, we cannot conclude that there is an insufficient nexus between State Exhibits 48 and

---

[7] Okoji was able to identify Terlep in court.

[8] Jane Nagano's name is stamped into the box entitled "WORKER'S NAME" on Terlep's "APPLICATION FOR FINANCIAL AND FOOD STAMPS ASSISTANCE" (State's Exhibit 8). She is a DHS eligibility worker.

49 and Terlep just because they only identify Terlep by the name "Kehaulani Terlep."

    **B.    THE CIRCUIT COURT PROPERLY DENIED TERLEP'S MOTION FOR JUDGMENT OF ACQUITTAL.**

Terlep contends the circuit court erred in denying her oral motion for judgment of acquittal because State's Exhibits 48 and 49 did not meet the requirements of HRE 803(b)(6) and the State presented no proof that Terlep received DHS payments. Because we conclude that State's Exhibits 48 and 49 did meet the requirements for admission under HRE 803(b)(6), we reject Terlep's first point.

For her second point, Terlep argues that

> assuming arguendo DHS made the aforesaid payments, there was no evidence at the close of the State's case that [Terlep] had received the payments. There was no evidence that the payments were mailed to [Terlep]. And, if payments were made by direct deposit, to which bank, to which account. There was nothing to connect the account of [Terlep], if any.

This argument is without merit.

The State's case-in-chief established the elements of Theft in the Second Degree, HRS § 708-831, such that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." State v. Hicks, 113 Hawai'i 60, 69, 148 P.3d 493, 502 (2006) (quoting State v. Maldonado, 108 Hawai'i 436, 442, 121 P.3d 901, 907 (2005)).

HRS § 708-831 provides in relevant part:

> §708-831 **Theft in the second degree.** (1) A person commits the offense of theft in the second degree if the person commits theft:
>
>     . . . .
>
>     (b)    Of property or services the value of which exceeds $300[.]

HRS § 708-830 (1993) defines "theft" in relevant part:

> §708-803 **Theft.** A person commits theft if the person does any of the following:
>
>     . . . .
>
>     (2)    Property obtained or control exerted through deception. A person obtains, or exerts control

over, the property of another by deception with
intent to deprive the other of the property.

The evidence indicates that Terlep exerted control over the property of another from January 1, 1999 through September 30, 2001. Higa reviewed the DHS investigation on Terlep, the overpayments calculated against Terlep, and Terlep's public assistance file at DHS. Higa determined that Terlep was ineligible for the assistance she received in January 1999 because she began living with Cabatbat in the same house.[9] Cabatbat's earnings from Davidson Construction increased Terlep's total household income and resulted in an overpayment to Terlep. Higa further determined that Terlep's ineligibility extended to September 30, 2001, when her case closed.[10]

From January 1999 to September 30, 2001, Terlep received financial and food stamp assistance to which she was not entitled. The amount Terlep received over this period exceeded $300.

Additionally, Terlep engaged in deception to acquire benefits to which she was not entitled over her ineligibility period. HRS § 708-800 (1993) provides:

§708-800 **Definitions of terms in this chapter.**
. . . .

"Deception" occurs when a person knowingly:

(1)     Creates or confirms another's impression which is false and which the defendant does not believe is true;

(2)     Fails to correct a false impression which the person previously has created or confirmed[.]

---

[9]   Higa based her determination on Terlep's May 14, 2003 MOTHER'S DECLARATION REGARDING CUSTODY, wherein Terlep affirmatively declares under penalty of perjury that she reunited with Cabatbat in January 1999 and they remained together until they separated in December 2001. On the same form, Terlep identifies Cabatbat as the father of her two children.

[10]   Terlep's case closed because she became employed by Clinical Laboratories and, as a result, her total household income was in excess of the eligibility limits.

Okoji testified that she interviewed Terlep for financial and food stamp assistance on February 1, 2000 and February 12, 2001. Okoji explained at trial that, as part of the interview process, she informs applicants of their rights and responsibilities, which include the responsibility to provide DHS with accurate and complete information. Okoji testified that in spite of this advisement, Terlep did not disclose in her initial interview or her corresponding application that Cabatbat was living with Terlep and her child.

Okoji further testified that none of Terlep's Monthly Eligibility Report Forms (MERFs) from January 2000 to January 2001 indicated that Cabatbat was living in the household. Additionally, in her second interview with Okoji on February 12, 2001, Terlep did not reveal that Cabatbat was living with her.

Higa testified that none of Terlep's MERFs from December 1998 through December 1999 indicated that Cabatbat was living with Terlep.

Okoji and Higa's testimonies provide overwhelming evidence of Terlep's deception.

Terlep engaged in this deception "with intent to deprive the other of the property." HRS § 708-830(2). Both Terlep's Applications for Financial and Food Stamps Assistance and her MERFs contain explicit warnings about engaging in dishonest conduct, including hiding information. Furthermore, at trial, Terlep admitted that having Cabatbat live with her would impact her welfare eligibility:

> Q. [The State:] Right. And that if you were living together and receiving welfare, that whatever income William Cabatbat would have brought into the household, that would have had to have been calculated to determine whether you were eligible for welfare or not; isn't that correct?
>
> A. [Terlep:] If he were living in the household, yes.

C.    TERLEP WAS NOT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL.

Terlep contends she was denied effective assistance of counsel because defense counsel should have called Drs. Hall and Yang to testify about Terlep's mental condition.  Terlep argues that their testimonies would have addressed whether Terlep formed the requisite intent to commit theft under the circumstances.[11]

> When reviewing a claim of ineffective assistance of counsel, [the appellate court] looks at whether defense counsel's assistance was within the range of competence demanded of attorneys in criminal cases.  The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test:  1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.  To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense.  A defendant need not prove actual prejudice.

State v. Wakisaka, 102 Hawai'i 504, 513-14, 78 P.3d 317, 326-27 (2003) (internal quotation marks, citations, and footnote omitted).

The State filed a motion for a mental examination "to determine whether [Terlep] is fit to proceed pursuant to [HRS §] 704-404."[12]  The circuit court received reports from Dr. Cunningham, Dr. Hall, and Dr. Yang.  The reports unanimously expressed the opinion that Terlep was fit to proceed.

---

[11]  These "difficult" circumstances include the effect of Cabatbat's child support payments on Terlep's intent, the State's confusion in wrongly charging Terlep for the two months of assistance to which she was entitled, the State's confused reliance on DHS forms as a basis for the charge against Terlep, and Terlep's "long psychiatric history."

[12]  HRS 704-404(1) (1993) provides:

> §704-404  **Examination of defendant with respect to physical or mental disease, disorder, or defect.**  (1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution.

Terlep characterizes the reports as "sympathetic" and argues that "[i]t was a serious mistake not to call the doctors as witnesses [because] [g]iven these circumstances the doctors['] reports would have helped [Terlep's] case."

In the instant case, we recognize that the record contains reports from each of the three doctors who conducted Terlep's mental examination. Terlep cites excerpts from two of the reports, purportedly addressing her emotional mental instability, as "reliable and [to] show what the witnesses would have said." However, all three reports unanimously expressed the opinion that Terlep was fit to proceed.

There is no evidence suggesting that defense counsel's decision not to call Drs. Yang and Hall was a result of "a failure to conduct a minimal investigation." State v. Richie, 88 Hawai'i 19, 40 n.16, 960 P.2d 1227, 1248 n.16 (1998).

"The decision whether to call witnesses in a criminal case is normally a matter within the judgment of counsel and, accordingly, will rarely be second-guessed by judicial hindsight." State v. Aplaca, 74 Haw. 54, 70, 837 P.2d 1298, 1307 (1992) (internal quotation marks and citation omitted).

Viewing defense counsel's assistance, as a whole, we cannot say that the decision not to call Drs. Yang and Hall as witnesses was not "within the range of competence demanded of attorneys in criminal cases." Richie, 88 Hawai'i at 39, 960 P.2d at 1247 (internal quotation marks and citation omitted).

Terlep also argues that she was denied effective assistance of counsel because defense counsel failed to discredit Camille Hauanio (Hauanio) at trial. Terlep contends:

> By objecting to the [State's] questioning concerning witness HAUANIO's snooping on [Terlep], given that as the court stated HAUANIO was the only truthful witness, defense counsel deprived [Terlep] of the opportunity to discredit HAUANIO. This was a potentially meritorious point. Witness HAUANIO was not reliable. The court, which singled HAUANIO out as being credible, could have been dissuaded had defense counsel pursued cross-examination of witness HAUANIO on this point.

We decline to second-guess defense counsel's decision to object to rather than cross-examine Hauanio on her "snooping" for information. Richie, 88 Hawai'i at 39, 960 P.2d at 1247 (citing to American Bar Association Standards for Criminal Justice--Prosecution Function and Defense Function, Standard 4-5.2 (3d ed. 1993), which includes "whether and how to conduct cross-examination" as useful guidance for determining which decisions are left to counsel's discretion).

Viewing defense counsel's assistance, as a whole, we cannot say that it was not "within the range of competence demanded of attorneys in criminal cases. Richie, 88 Hawai'i at 39, 960 P.2d at 1247.

Therefore,

IT IS HEREBY ORDERED that the Amended Judgment filed on December 15, 2008 in the Circuit Court of the Third Circuit is affirmed.

DATED: Honolulu, Hawai'i, September 21, 2010.

On the briefs:

John L. Olson
for Defendant-Appellant.

Lawrence A. Goya,
Senior Deputy Attorney General,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge